*HHW*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
7-25-2008
JUL 25 2008

JUDGE ELAINE E. BUCKLO
UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 07 CR 795 |
| vs. | ) | |
| | ) | Judge Elaine Bucklo |
| MICHAEL COURTNEY | ) | |

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant MICHAEL COURTNEY, and his attorney, TERENCE P. GILLESPIE, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A) and Rule 11(c)(1)(B), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2. The indictment in this case charges defendant with two counts of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2.

3. Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the indictment.  Count One charges defendant with wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charges contained in Count One of the indictment.  In pleading guilty, defendant admits the following facts and that those facts establish his guilt and relevant conduct beyond a reasonable doubt:

Defendant is the owner and president of Madava Inc. ("Madava"), a company that builds and develops residential construction projects in the Chicago area.  Defendant, through Madava, developed a five-unit condominium building called University Townes, located at 6458 S. Greenwood in Chicago.  Defendant purchased 6458 S. Greenwood as a vacant lot in 2004 and took out lines of credit totaling $600,000 from Beverly Bank to finance the construction.

Defendant originally listed the five units for sale at University Townes with MetroPro, a real estate brokerage firm based in Chicago.  Each unit was listed for approximately $390,000.  MetroPro showed the units to several prospective buyers, but none could qualify for financing.  One deal for the purchase of a unit fell through at the closing.  It was important to defendant that he sell these units as quickly as possible because the real estate market had slowed down and he had to repay Beverly Bank the money he had borrowed.

2

About a year or two prior to defendant's efforts to sell the University Townes condominium units, he met co-defendant Robert Fletcher, a real estate investor and contractor.    While defendant was trying to sell the University Townes units, Fletcher expressed interest in buying Unit B for $390,000. A few weeks later, Fletcher told defendant that he could not finance the purchase at the $390,000 sale price. Defendant told Fletcher that the lowest he could sell the unit for was $315,000. Fletcher told defendant that he would buy Unit B for $315,000, though they agreed that the purchase price would still appear to be $390,000. Defendant knew that making the sale price appear to be $390,000 would enable him to continue to market the other units at that price and would enable Fletcher to tell potential lenders and appraisers that the market value of the property was $390,000.

After defendant and Fletcher agreed on a sale price of $315,000, Fletcher requested that defendant send him a letter of deposit showing that he (Fletcher) had purportedly deposited $78,000 in earnest money with Madava, which would be 20% of a $390,000 purchase price.  Fletcher told defendant that he needed this letter of deposit to obtain financing. Although defendant only dealt with Fletcher regarding the sale of Unit B, Fletcher informed defendant that Individual A would be the individual actually purchasing the unit. Although defendant knew that neither Fletcher nor Individual A had deposited or would deposit earnest money with Madava, defendant directed Individual B to draft a letter of deposit, sign it, and fax it to Fletcher.  Individual B sent this letter, which was dated June 29, 2007, falsely stating that Individual A had deposited a check in the amount of $39,000 in

3

earnest money with Madava for the purchase of Unit B located at 6458 S. Greenwood Avenue in Chicago. Either shortly before or after Individual B sent this letter, Fletcher provided defendant a copy of what purported to be a Chase Official Check dated June 29, 2007 payable to Madava Inc. in the amount of $39,000. The check identified Individual A as the remitter.

At Fletcher's request, defendant instructed Individual B to send Individual A a second letter purporting to confirm that Individual A had deposited an additional $39,000 as a down payment with Madava. This second letter was dated July 30, 2007. On September 7, 2007, Fletcher faxed defendant a copy of what purported to be another Chase Official Check, this one dated July 30, 2007, in the amount of $39,000 payable to Madava. The second check also identified Individual A as the remitter. Fletcher told defendant that the checks were good, but defendant fully understood that he would not be receiving any earnest or down payment money from Robert Fletcher or Individual A. Defendant knew that the letters of deposit and the photocopies of the earnest money checks were created only to make it appear to a prospective lender that Fletcher and Individual A had the financial resources for the purchase of Unit B, which defendant needed to sell.

On September 5, 2007, Fletcher faxed defendant a signed real estate sales contract for Unit B at University Townes. This contract was on a form provided by Madava. The contract listed the purchaser as Individual A and falsely listed the sale price as $390,000. The contract also included a mortgage contingency stating that Individual A intended to get

4

a loan of $312,000, and that Individual A had deposited $39,000 in earnest money with Madava and intended to deposit an additional $39,000. Defendant knew that neither Fletcher nor Individual A intended to deposit $78,000 with him, but defendant agreed to this language in order to sell Unit B.

The closing for Unit B took place on October 26, 2007. Defendant did not attend the closing. Defendant authorized his attorney to sign the settlement statement, in which Fletcher and Courtney stated that the sales price was $390,000. Defendant reviewed the closing packet with his attorney prior to the closing. Defendant knew that the settlement statement was false because both he and Individual A represented that Individual A had deposited $78,000 in earnest money with Madava when in fact Individual A had not deposited any money with defendant, and that as a result, the sales price was actually $312,000.

It was further part of the scheme that Fletcher caused a false loan application to be submitted to World Savings Bank (now Wachovia) falsely stating that, among other things, the purchase price of Unit B was $390,000 and that Fletcher had given Madava a $78,000 down payment. Defendant was aware that Fletcher would do so, knowing that the lender would rely upon these false statements. As was foreseeable to defendant, World Savings Bank relied on the false representations in the loan application and on October 26, 2007 disbursed approximately $312,000 in loan proceeds.

Defendant and Fletcher undertook a virtually identical approach to an anticipated purchase by Fletcher of Unit C at University Townes. On September 5, 2007, Fletcher faxed defendant a signed real estate sales contract for this unit. It listed the sale price as $391,000 and Fletcher as the purchaser. It also falsely stated that Fletcher had paid $39,000 to Madava and would pay an additional $39,000. As he did for the purchase of Unit B, Fletcher requested from defendant letters of deposit showing that he (Fletcher) had made a $78,000 down payment to Madava. Defendant instructed Individual B to send Fletcher those letters. Individual B sent Fletcher one letter dated June 29, 2007, and another dated July 30, 2007. Each letter indicated that Fletcher had deposited $39,000 with Madava, though in fact, as defendant knew, Fletcher had not. Fletcher sent defendant copies of what purported to be two Chase Official Checks, one dated June 29, 2007 and the other dated July 30, 2007. Each of these checks was made payable to Madava Inc. in the amount of $39,000 and identified Robert Fletcher as the remitter. Defendant knew that he would not actually be receiving any earnest money or down payment funds from Fletcher and that the letters and checks would be used to falsely represent to a prospective lender that he had.

The closing for Unit C was set to take place on December 4, 2007. Defendant reviewed the settlement statement with his attorney prior to the closing. Defendant knew that the settlement statement was false because it misstated the sale price and both he and Fletcher falsely represented that Fletcher had deposited $78,000 in earnest money with Madava when in fact Fletcher had not.

6

It was further part of the scheme that Fletcher caused a false loan application to be submitted to Equity Mortgage Corporation falsely stating that, among other things, the purchase price of Unit C was $391,000 and that Fletcher had given Madava a $78,000 down payment. As was foreseeable to defendant, Equity Mortgage Corporation relied on the false representations in the loan application and on December 4, 2007 disbursed approximately $312,000 in loan proceeds.

Defendant admits that, in furtherance of the scheme described above, on October 26, 2007, he caused a wire transfer of $312,967.40 to be sent from World Savings Bank in San Antonio, Texas to Chicago, Illinois, to fund the loan used to purchase 6458 S. Greenwood Ave., Unit B, Chicago, Illinois. Defendant further admits that, in furtherance of the scheme described above, on December 4, 2007, he caused a wire transfer in the amount of $311,814.37 to be sent from Horizon Bank in Michigan City, Indiana (Equity Mortgage Corporation's bank) to Chicago, Illinois, to fund the loan to be used to purchase 6458 S. Greenwood Ave., Unit C, Chicago, Illinois.

7.    The foregoing facts are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

8.      Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.      A maximum sentence of 30 years' imprisonment because the violation affected a financial institution.  Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense.  This offense also carries a maximum fine of $1,000,000.  Defendant further understands that the judge also may impose a term of supervised release of not more than five years.

b.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the count to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

9.      Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines.  Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines**.  The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing.  The following statements regarding

8

the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely, the November 2007 Guidelines Manual.

   b.   **Offense Level Calculations.**

      i.   The base offense level for the charges in Count One of the Indictment is 7, pursuant to Guideline § 2B1.1(a)(1);

      ii.   The base offense level is increased by 10 levels pursuant to Guideline § 2B1.1(b)(1)(F) because the loss amount is $144,000 which is greater than $120,000 and less than $200,000. For purposes of calculating the loss amount, defendant acknowledges that the mortgage loan secured by Unit B is in default status and that the lender on the Unit B transaction, World Savings Bank (now Wachovia Mortgage, FSB), has estimated that, should it foreclose on Unit B, the most it is likely to recover is $240,000 and agrees that this is a reasonable estimate. Defendant further acknowledges that, due to the fraudulent conduct described in paragraph 6 above, World Savings Bank lent Individual A $312,000 to purchase Unit B. Therefore, the total loss applicable to defendant's role in the Unit B transaction is $72,000 (loan amount of $312,000 minus collateral fair market value of $240,000). Defendant further acknowledges that, because the fraudulent Unit B and Unit C transactions were structured virtually identically, the intended loss attributed to defendant's role in the attempted Unit C transaction is also $72,000.

      iii.   Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not

9

receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

iv.     In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.  Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.     **Criminal History Category.**  With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.     **Anticipated Advisory Sentencing Guidelines Range.**  Therefore, based on the facts now known to the government, the anticipated offense level is 14, which, when combined with the anticipated criminal history category of I, results in an anticipated

advisory Sentencing Guidelines range of to 15 to 21 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

        e.      Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature and based on facts known to the parties as of the time of this Plea Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

        f.      Both parties expressly acknowledge that while none of the Guideline calculations set forth above are binding on the Court or the Probation Office, the parties have agreed pursuant to Fed.R.Crim.P. 11(c)(1)(B) that certain components of those calculations – specifically, those set forth above in subparagraphs b and c of this paragraph – are binding on the parties, and it shall be a breach of this Plea Agreement for either party to present or advocate a position inconsistent with the agreed calculations set forth in the identified subparagraphs.

        g.      Defendant understands that with the exception of the Guideline provisions identified above as binding on the parties, the Guideline calculations set forth above are non-binding predictions, upon which neither party is entitled to rely, and are not

governed by Fed.R.Crim.P. 11(c)(1)(B). Errors in applying or interpreting any of the Sentencing Guidelines (other than those identified above as binding) may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

### Cooperation

11.    Defendant agrees he will fully and truthfully cooperate with the United States Attorney for the Northern District of Illinois in any matter in which he is called upon to cooperate. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Only the United States Attorney for the Northern District of Illinois may require defendant's cooperation pursuant to this Plea Agreement. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

12.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then

the government shall move the Court, pursuant to Guideline §5K1.1 , to depart downward from the low end of the applicable guidelines range, and shall recommend a sentence equal to two-thirds of the low end of the applicable guidelines range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court.

13.     If the government does not move the Court, pursuant to Sentencing Guideline §5K1.1, to depart from the applicable Guideline range, as set forth above, the preceding paragraph of this plea agreement will be inoperative, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to §5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline §5K1.1.

14.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Plea Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

15.     Regarding restitution, the parties acknowledge that  pursuant to Title 18, United States Code, § 3663A, the court must order defendant, together with any jointly liable co-defendants, to make full restitution to the victims in an amount to be determined by the

13

Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing. Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing.

16.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.    Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A), after sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining count of the indictment as to this defendant.

### Presentence Investigation Report/Post-Sentence Supervision

18.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

19.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the

14

probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of his sentence for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

20.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

21.     This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 795.

15

22.     This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

23.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.      **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.      The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where

16

actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.　　If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.　　If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.　　At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.　　At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could

17

require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b. **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

18

     c.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Other Terms

24.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

25.     Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

26.     Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations

on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

27.    Should the judge refuse to accept defendant's plea of guilty, this Plea Agreement shall become null and void and neither party will be bound thereto.

28.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

29.    Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____7-25-08_____

_____
PATRICK J. FITZGERALD
United States Attorney

_____
STEVEN A. BLOCK
Assistant U.S. Attorney

_____
MICHAEL COURTNEY
Defendant

_____
TERENCE P. GILLESPIE
Attorney for Defendant

20